# Exhibit 1



**CREW** | citizens for responsibility and ethics in washington

November 25, 2008

FOIA Officer
Freedom of Information Act Office
Department of the Army
7701 Telegraph Road
Suite 144
Alexandria, VA 22315-3905

**By Fax:        703-428-6522**

**Re: Freedom of Information Act Request**

Dear Sir or Madam:

Citizens for Responsibility and Ethics in Washington ("CREW") makes this request for records, regardless of format, medium, or physical characteristics, and including electronic records and information, audiotapes, videotapes and photographs, pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. §§ 552, et seq.

Specifically, CREW seeks any and all records from the U.S. Army, dating from January 1, 2001 to the present concerning:

1) the Army's policies related to soldiers accused of acts of domestic violence;

2) the number of soldiers arrested for domestic violence related offenses;

3) the number of soldiers prosecuted, the number of soldiers convicted, and the number of soldiers jailed for domestic violence crimes;

4) the number of soldiers dishonorably discharged following a conviction for a domestic violence offense;

5) the number of soldiers honorably discharged following a conviction for a domestic violence offense;

6) the number of soldiers promoted following a conviction for a domestic violence offense;

7) the number of soldiers deployed while a domestic violence investigation or prosecution was ongoing;

FOIA Officer
November 25, 2008
Page Two

8) the number of soldiers ordered to attend anger management classes and/or counseling as a result of a domestic violence complaint pursuant to a deferred prosecution agreement or diversion program;

9) the number of soldiers prosecuted or jailed following a failure to attend mandated anger management classes and/or counseling ordered as a result of a domestic violence complaint;

10) records demonstrating soldiers' attendance of such classes, and records pertaining to any actions taken if and when soldiers failed to attend such classes as ordered;

11) the number of soldiers issued "no contact" orders following domestic violence complaints against them;

12) the number of soldiers who violated "no contact" orders issued following domestic violence complaints;

13) the number of soldiers prosecuted or jailed for violating "no contact" orders issued following domestic violence complaints;

14) the number of domestic violence related offenses committed by soldiers against whom "no contact" orders were in effect at the time of the offenses;

15) the number of times the Army has requested that a civilian prosecuting authority transfer jurisdiction of a domestic violence crime to the military;

16) the number of times the Army has initiated its own prosecution against an alleged perpetrator of domestic violence following the transfer of jurisdiction from a civil prosecuting authority;

17) the number of times the Army has declined to prosecute a domestic violence crime after having requested a transfer of jurisdiction from a civilian prosecuting authority; and

18) any and all decisions by the Army not to prosecute any individual for a domestic violence crime because such a prosecution would have prevented the Army from deploying the alleged perpetrator to Iraq, or other foreign country.

19) any and all records of all case review committees, including but not limited to those at Fort Riley in Kansas and Fort Bragg in North Carolina, regarding the handling of domestic violence complaints and the treatment of those soldiers alleged to have committed such offenses.

FOIA Officer
November 25, 2008
Page Three

Please search for responsive records regardless of format, medium, or physical characteristics. Where possible, please produce records electronically, in PDF or TIF format on a CD-ROM. We seek records of any kind, including electronic records, audiotapes, videotapes, and photographs. Our request includes any telephone messages, voice mail messages, daily agenda and calendars, information about scheduled meetings and/or discussions, whether in-person or over the telephone, agendas for those meetings and/or discussions, participants included in those meetings and/or discussions, minutes of any such meetings and/or discussions, the topics discussed at those meetings and/or discussions, e-mail regarding meetings and/or discussions, e-mail or facsimiles sent as a result of those meetings and/or discussions, and transcripts or notes of any such meetings and/or discussions.

If it is your position that any portion of the requested records is exempt from disclosure, CREW requests that you provide it with an index of those documents as required under Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir. 1973), cert. denied, 415 U.S. 977 (1972). As you are aware, a Vaughn index must describe each document claimed as exempt with sufficient specificity "to permit a reasoned judgment as to whether the material is actually exempt under FOIA." Founding Church of Scientology v. Bell, 603 F.2d 945, 949 (D.C. Cir. 1979). Moreover, the Vaughn index must "describe each document or portion thereof withheld, and for each withholding it must discuss the consequences of supplying the sought-after information." King v. U.S. Dep't of Justice, 830 F.2d 210, 223-24 (D.C. Cir. 1987) (emphasis added). Further, "the withholding agency must supply 'a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply.'" Id. at 224 (citing Mead Data Central v. U.S. Dep't of the Air Force, 566 F.2d 242, 251 (D.C. Cir. 1977).

In the event that some portions of the requested records are properly exempt from disclosure, please disclose any reasonably segregable non-exempt portions of the requested records. See 5 U.S.C. § 552(b). If it is your position that a document contains non-exempt segments, but that those non-exempt segments are so dispersed throughout the document as to make segregation impossible, please state what portion of the document is non-exempt, and how the material is dispersed throughout the document. Mead Data Central, 566 F.2d at 261. Claims of nonsegregability must be made with the same degree of detail as required for claims of exemptions in a Vaughn index. If a request is denied in whole, please state specifically that it is not reasonable to segregate portions of the record for release.

## Fee Waiver Request

In accordance with 5 U.S.C. § 552(a)(4)(A)(iii) and 32 C.F.R. § 518.19(d), CREW requests a waiver of fees associated with processing this request for records. The subject of this request concerns the operations of the federal government and expenditures, and the disclosures will likely contribute to a better understanding of relevant government procedures by CREW and

FOIA Officer
November 25, 2008
Page Four

the general public in a significant way. Moreover, the request is primarily and fundamentally for non-commercial purposes. 5 U.S.C. § 552(a)(4)(A)(iii). See, e.g., McClellan Ecological v. Carlucci, 835 F.2d 1282, 1285 (9th Cir. 1987).

These records are likely to contribute to greater public awareness of the processes that the Department of the Army employs in responding to allegations of domestic violence. Specifically, these records are likely to shed light on how and why Sgt. Carlos Renteria was able to evade consequences for beating his wife, Adriana Renteria, despite assurances made to the Tom Green County, Texas prosecutor that the Army would handle the matter. Lizette Alvarez, Despite Assurances from Army, an Assault Case Founders *The New York Times*, November 23, 2008 (attached as Exhibit 1). Further, given that domestic violence incidents, including homicides, have increased among combat troops over the past two years, there is substantial public concern and interest in this issue. *See i.e.*, Lizette Alvarez and Deborah Sontag, When Strains on Military Families Turn Deadly, *The New York Times*, February 15, 2008 (attached as Exhibit 2); Estes Thompson, *Associated Press*, Soldier's Death Renews Criticism of Army, *The Houston Chronicle*, October 4, 2008 (attached as Exhibit 3); Paloma Esquivel and Christine Hanley, Family Tells of Alleged Killer's Post-Iraq Mental Troubles, *The Los Angeles Times*, September 3, 2008 (attached as Exhibit 4).

CREW is a non-profit corporation, organized under section 501(c)(3) of the Internal Revenue code. CREW is committed to protecting the public's right to be aware of the activities of government officials and to ensuring the integrity of those officials. CREW is dedicated to empowering citizens to have an influential voice in government decisions and in the government decision-making process. CREW uses a combination of research, litigation, and advocacy to advance its mission. The release of information garnered through this request is not in CREW's financial interest. In addition, CREW will disseminate any documents it acquires from this request to the public through www.governmentdocs.org, an interactive website CREW founded that includes thousands of pages of public documents from a number of organizations in addition to CREW. CREW's website also contains links to thousands of pages of documents CREW acquired from multiple FOIA requests. See www.citizensforethics.org. CREW's website includes documents relating to CREW's FOIA litigation, Internal Revenue complaints, and Federal Election Commission complaints.

Under these circumstances, CREW fully satisfies the criteria for a fee waiver.

FOIA Officer
November 25, 2008
Page Five

### Conclusion

If you have any questions about this request or foresee any problems in releasing fully the requested records, please contact me at (202) 408-5565.  Also, if CREW's request for a fee waiver is not granted in full, please contact me immediately upon making such determination.

Sincerely,

Melanie Sloan
Executive Director

Encls.

EXHIBIT 1

2 of 1471 DOCUMENTS

Copyright 2008 The New York Times Company
The New York Times

November 23, 2008 Sunday
Late Edition - Final

SECTION: Section A, Column 0; National Desk; Pg. 24

LENGTH: 1666 words

HEADLINE: Despite Assurances From Army, an Assault Case Founders

BYLINE: By LIZETTE ALVAREZ

BODY:

On Christmas Day two years ago, Sgt. Carlos Renteria, recently back from his first tour in Iraq, got drunk and, during an argument, began to choke his wife, Adriana. He body-slammed her. He threw her onto the couch, grabbed a cushion and smothered her, again and again -- until, finally, he stopped, she told the police in San Angelo, Tex.

He was arrested and charged with assault, and she went to the hospital for her injuries, which included bruises and a severely swollen knee. It was his second domestic violence arrest. Assured by an Army officer that the military would pursue the case, the Texas prosecutor bowed out.

Yet Sergeant Renteria has faced no consequences. Instead, since his arrest, he has been redeployed to Iraq and promoted to staff sergeant.

"I was told it would be taken care of, in more than one instance, by the Army," said Ms. Renteria, 30, referring to the assault charges. "That they would help me. And I believed them."

For nearly two years, she has prodded Sergeant Renteria's chain of command, the inspector general at Fort Riley in Kansas (where he was transferred), the base's military lawyers and its domestic violence office, e-mail messages and letters show. But Sergeant Renteria has not received any counseling, and the military justice system has said it will not prosecute him. The couple divorced last month.

Ms. Renteria's story illustrates the serious gaps in the way the Army handles domestic violence cases and the way it treats victims, despite promises to take such crimes more seriously.

More than five years ago, after a series of wife-killings by soldiers, a Pentagon task force investigation concluded that the military was doing a better job of shielding service members from punishment than protecting their wives from harm. The Department of Defense began to make noticeable improvements, including expanding protections and services for victims. But problems clearly remain.

The prosecutor in the Renteria case, Allen Wright, was so concerned by the Army's inaction that in May, he moved to take back the case, issuing an arrest warrant for Sergeant Renteria.

The warrant remains outstanding. The Army acknowledged that Ms. Renteria's case had been misbandled.

Despite Assurances From Army, an Assault Case Founders The New York Times November 23, 2008 Sunday

"I'm angry," said Maj. Nathan Bond, public affairs officer at Fort Riley, after The New York Times brought the case to the Army's attention. "This is not my Army. This is not how we handle domestic violence cases."

The Army's handling of such cases is especially important in a time of war, when the number of soldiers suffering from post-traumatic stress disorder escalates. Studies show a link between the disorder and increased violence in the home.

The Army says that the measures it has taken have been effective in curbing domestic violence. But advocates of victims of domestic violence say that among combat troops the violence has spiked in the past two years and that women are often disinclined to report violence for fear of angering their partners and hurting their careers.

These advocates point to the gruesome murders of three female soldiers based at Fort Bragg in North Carolina within the last four months. One woman's body was dismembered and dumped in the woods. Another woman, seven months pregnant, was found dead in a motel bathtub. The third was stabbed to death.

In each case, the victim's boyfriend or husband, a soldier or marine, has been charged in the killing. All three suspects were deployed in Iraq at some point.

The recent killings, which echo a series of wife-killings by soldiers at the fort in 2002, have captured the attention of the Pentagon again. During a visit last month to Fort Bragg, Defense Secretary Robert M. Gates said he was "very concerned" about the stress on combat troops. "We obviously want to stop all kinds of violence among our soldiers and families," he said.

Yet an examination of Ms. Renteria's case shows she had sought help from an array of people for behavior by her husband that the Army could trace to 2004.

"She has really tried to pursue this to make sure he gets the appropriate intervention," said Jacquelyn Campbell, a professor at Johns Hopkins University School of Nursing and a member of the Pentagon's task force on domestic violence, who was told about the case by The Times. "We had hoped with the military's new awareness of the issues of domestic violence in the military, and with its new policies and procedures around addressing it, that this kind of thing wouldn't be happening still."

Carlos and Adriana Renteria fell in love listening to Cuban music in Miami Beach in May 2002. They were still newlyweds when the relationship began to sour, she said, marred by his sudden absences and verbal abuse.

On Dec. 12, 2004, drunk and angry, he grabbed a baseball bat and swung it at her as she held their infant son, according to the military police report. The bat stopped just short of her head, brushing her cheek.

Twenty minutes later, he threatened to kill her. She called the military police at Goodfellow Air Force Base in San Angelo, Tex., where the couple was stationed.

Sergeant Renteria was ordered to take anger management classes on base. He attended one class. " 'I can't be touched, can't you see?' " Ms. Renteria said her husband told her. " 'They aren't going to do anything to me.' "

The couple separated and then reunited on a promise that Sergeant Renteria would change. But his behavior grew more erratic after his return from Iraq in October 2006. He cut himself one day to test his pain threshold. He asked to choke her, as an experiment. She said no.

Two months later, she said, he did not bother to ask.

When the police showed up at her door, they asked whether her husband had just returned from an "overseas assignment."

She said yes.

"Ever since he has returned there have been problems with Carlos's behavior and mood swings," she told them, according to the police report. She said. "Carlos was also having nightmares while sleeping and has also been drinking to the point of intoxication on a regular basis."

Mr. Wright, the prosecutor in Tom Green County, Tex., received a phone call from an officer at Fort Riley in January 2007 asking if he would be willing to hand over the case. (The military can request jurisdiction when a service member is arrested.) Sergeant Renteria was due to be transferred to the base, so Mr. Wright agreed. "The Army assured me they would take care of it -- counseling, monitoring," Mr. Wright said. "We all want to help our military."

At a meeting in July 2007, First Sgt. Robert L. Simmons, the highest-ranking noncommissioned officer in her husband's unit, also promised Ms. Renteria that the Army would go beyond sending her husband to classes for anger and alcohol, which had not worked the first time. He said the Army would prosecute, Ms. Renteria said.

Sergeant Simmons said he, too, had seen her husband lose his cool at work and was sufficiently concerned to request a three-week "no contact" order for Sergeant Renteria to keep away from his wife. Sergeant Simmons added that he would move to get her husband prosecuted on the assault charge to prevent him from redeploying to Iraq. Under federal law, offenders convicted of domestic violence are banned from using weapons. That would have prevented Sergeant Renteria from going to Iraq.

A few weeks later, Sergeant Simmons was deployed to Iraq, and Ms. Renteria said she never heard from him again.

Fort Riley quickly closed ranks around Sergeant Renteria. That became clear to Ms. Renteria after a brief conversation in August 2007 with an assistant at the inspector general's office. " 'Honey, we are not going to bring a soldier back who beat on his wife a couple of times or because you feel things weren't done correctly,' " Ms. Renteria said, recalling the conversation. " 'He is over there fighting for his life.' "

Seven months later, with no word from the Army, Ms. Renteria called Mr. Wright in Texas, in tears. He eventually reached a lawyer at Fort Riley, an Army captain, who, to Mr. Wright's astonishment, said he was under the impression that Mr. Wright had closed the case because it was "deficient." Mr. Wright corrected him. He gave Fort Riley 90 days to tell him exactly what the Army had done.

When the Army did not respond, "I issued a warrant before any more time lapsed," Mr. Wright said.

Sergeant Renteria returned home from Iraq on leave in May, but went back before the warrant could be processed. After The Times provided the Army with details of the case last month, it looked into the matter.

"The accusation of domestic violence is taken very seriously," Major Bond said, adding that such cases could be a "mess." In this case, "there were some communication issues," he said.

Major Bond said the case review committee at Fort Riley concluded in the summer of 2007 that Sergeant Renteria should attend an anger management and alcohol abuse program. Instead he was redeployed to Iraq.

He will attend classes upon his return, Major Bond said. Sergeant Renteria, who is in the process of transitioning home from Iraq, could not be reached for comment.

In the end, his command opted not to prosecute. Major Bond would not explain why, citing privacy reasons.

"Whether it has moved along at the speed we would have liked is questionable," Major Bond said of the case. Nonetheless, he added, "The outcome is consistent with other cases."

But not deploying Sergeant Renteria was never an option, Major Bond said. "We are in the business of fighting a war, and we let very little interfere with that," he said.

Ms. Renteria's divorce became official in October, but the couple has two young sons, and she worries that his behavior, left unchecked after his second tour, will worsen. She has secured a restraining order.

"I feel that nobody is in my corner," Ms. Renteria said. "Because he wears a uniform, he is protected by everybody."

URL: http://www.nytimes.com

GRAPHIC: PHOTOS: Adriana Renteria reported a beating by her husband, Carlos, a soldier, in 2006. He was arrested but then redeployed to Iraq. (PHOTOGRAPH BY ED ZURGA FOR THE NEW YORK TIMES)
 Police photos showing injuries to Ms. Renteria's face and arm.

LOAD-DATE: November 23, 2008

EXHIBIT 2

166 of 403 DOCUMENTS

Copyright 2008 The New York Times Company
The New York Times

February 15, 2008 Friday
Correction Appended
Late Edition - Final

**SECTION:** Section A; Column 0; National Desk; WAR TORN; Pg. 1

**LENGTH:** 4579 words

**HEADLINE:** When Strains on Military Families Turn Deadly

**BYLINE:** By LIZETTE ALVAREZ and DEBORAH SONTAG; Alain Delaqueriere and Margot Williams contributed research.

**BODY:**

A few months after Sgt. William Edwards and his wife, Sgt. Erin Edwards, returned to a Texas Army base from separate missions in Iraq, he assaulted her mercilessly. He struck her, choked her, dragged her over a fence and slammed her into the sidewalk.

As far as Erin Edwards was concerned, that would be the last time he beat her.

Unlike many military wives, she knew how to work the system to protect herself. She was an insider, even more so than her husband, since she served as an aide to a brigadier general at Fort Hood.

With the general's help, she quickly arranged for a future transfer to a base in New York. She pressed charges against her husband and secured an order of protection. She sent her two children to stay with her mother. And she received assurance from her husband's commanders that he would be barred from leaving the base unless accompanied by an officer.

Yet on the morning of July 22, 2004, William Edwards easily slipped off base, skipping his anger-management class, and drove to his wife's house in the Texas town of Killeen. He waited for her to step outside and then, after a struggle, shot her point-blank in the head before turning the gun on himself.

During an investigation, Army officers told the local police that they did not realize Erin Edwards had been afraid of her husband. And they acknowledged that despite his restrictions, William Edwards had not been escorted off base "on every occasion," according to a police report.

That admission troubled the detective handling the case.

"I believe that had he been confined to base and had that confinement been monitored," said Detective Sharon L. Brank of the local police, "she would not be dead at his hands."

The killing of Erin Edwards directly echoed an earlier murder of a military wife that drew far more attention. Almost 10 years ago, at Fort Campbell in Kentucky, a different Army sergeant defied a similar restriction to base, driving out the front gate on his way to a murder almost foretold.

That 1998 homicide, one of several featured in a "60 Minutes" expose on domestic violence in the military, galvanized a public outcry, Congressional demands for action and the Pentagon's pledge to do everything possible to prevent such violence from claiming more lives.

Yet just as the Defense Department undertook substantial changes, guided by a Congressionally chartered task force on domestic violence that decried a system more adept at protecting offenders than victims, the wars in Afghanistan and then Iraq began.

Pentagon officials say that wartime has not derailed their efforts to make substantive improvements in the way that the military tackles domestic violence.

They say they have, for example, offered more parenting and couples classes, provided additional victims advocates and afforded victims greater confidentiality in reporting abuses.

But interviews with members of the task force, as well as an examination of cases of fatal domestic violence and child abuse, indicate that wartime pressures on military families and on the military itself have complicated the Pentagon's efforts.

"I don't think there is any question about that," said Peter C. McDonald, a retired district court judge in Kentucky and a member of the Pentagon's now disbanded domestic violence task force. "The war could only make things much worse than even before, and here we had a system that was not too good to begin with."

Connie Sponsler-Garcia, another task force member, who now works on domestic violence projects with the Pentagon, agreed.

"Whereas something was a high priority before, now it's: 'Oh, dear, we have a war. Well get back to you in a few months,' " she said.

The fatalities examined by The New York Times show a military system that tries and sometimes fails to balance the demands of fighting a war with those of eradicating domestic violence.

According to interviews with law enforcement officials and court documents, the military has sent to war service members who had been charged with and even convicted of domestic violence crimes.

Deploying such convicted service members to a war zone violates military regulations and, in some cases, federal law.

Take the case of Sgt. Jared Terrasas. The first time that he was deployed to Iraq, his prosecution for domestic violence was delayed. Then, after pleading guilty, he was pulled out of a 16-week batterers intervention program run by the Marine Corps and sent to Iraq again.

Several months after Sergeant Terrasas returned home, his 7-month-old son died of a brain injury, and the marine was charged with his murder.

Deployment to war, with its long separations, can put serious stress on military families. And studies have shown that recurrent deployments heighten the likelihood of combat trauma, which, in turn, increases the risk of domestic violence.

"The more trauma out there, the more likely domestic violence is," said Dr. Jacquelyn C. Campbell, a professor at the Johns Hopkins School of Nursing who also was a member of the Pentagon task force.

The Times examined several cases in which mental health problems caused or exacerbated by war pushed already troubled families to a deadly breaking point.

In one instance, the Air Force repeatedly deployed to Iraq, Afghanistan and elsewhere Sgt. Jon Trevino, a medic with a history of psychological problems, including post-traumatic stress disorder.

Multiple deployments eroded Sergeant Trevino's marriage and worsened his mental health problems until, in 2006, he killed his wife, Carol, and then himself.

The military declared his suicide "service related."

A Call to Action

Within a six-week period in 2002, three Special Forces sergeants returned from Afghanistan and murdered their wives at Fort Bragg in North Carolina. Two immediately turned their guns on themselves; the third hanged himself in a jail cell. A fourth soldier at the same Army base also killed his wife during those six weeks.

At the beginning of this wartime period, the cluster of murder-suicides set off alarms about the possible link between combat tours and domestic violence, a link supported by a study published that year in the journal Military Medicine. The killings also reinvigorated the concerns about military domestic violence that had led to the formation of the Defense Task Force on Domestic Violence two years earlier.

National attention to the subject was short-lived. But an examination by The Times found more than 150 cases of fatal domestic violence or child abuse in the United States involving service members and new veterans during the wartime period that began in October 2001 with the invasion of Afghanistan.

In more than a third of the cases, The Times determined that the offenders had deployed to Afghanistan or Iraq or to the regions in support of those missions. In another third, it determined that the offenders never deployed to war. And the deployment history of the final third could not be ascertained.

The military tracks only homicides that it prosecutes, and a majority of killings involving service members are handled by civilian authorities. To track these cases, The Times used records from the Army, Air Force and Navy -- the Marines did not provide any information --and local news reports.

It is difficult to know how complete The Times's findings are. What is clear, though, is that these homicides occurred at a time when the military was trying to improve its handling of domestic violence.

The Pentagon's domestic violence task force, appointed in April 2000 and comprising 24 military and civilian experts, met regularly for three years to examine a system where, they found, soldiers rarely faced punishment or prosecution for battering their wives and where they often found shelter from civilian orders of protection.

When the moment arrived to explain their findings and recommendations to Congress, however, the timing could not have been poorer. Deborah D. Tucker and Lt. Gen. Garry L. Parks of the Marines, the leaders of the task force, presented their final report to the House Armed Services Committee on the very day that the Iraq war began, March 20, 2003. Ms. Tucker called it "one of the more surreal experiences of my life."

"Periodically, members of the committee would call for a break and there would be some updated information provided on the status of our troops' entry into Iraq and how far they'd gotten," she said. "There was a map on an easel to the side."

"I knew that while we were at war all other considerations would push back," she added, "and I hoped that Operation Iraqi Freedom would be a quick matter on the order of Desert Storm."

The task force was disbanded, and its request to reconvene after two years to evaluate progress was rejected. But the Defense Department embraced most of its 200 recommendations and gradually made many changes, from the increase in advocates to domestic violence training for commanding officers.

"The services have taken huge strides to implement the recommendations," said David Lloyd, director of the Pentagon's Family Advocacy Program, starting with sending out "a strong message across the department that domestic violence is not acceptable."

Further, after the killings at Fort Bragg, Congress passed a law that made civilian orders of protection binding on military bases, and the Army gradually slowed the transition from war to home to help soldiers adjust.

Mr. Lloyd said he could not verify or comment on The Times's findings on domestic killings. But, he said, domestic fatalities do not provide a complete picture of the incidence of domestic violence in the military.

"You have a pie, a nine-inch shell, and you have a slice of that pie, but there are other slices: verbal abuse and psychological control and assault that didn't result in a homicide," Mr. Lloyd said. "Even if the fatality slice has increased and it would look larger, the other numbers have gone down."

According to the military, the number of general spouse and child abuse incidents reported to on-base family advocacy programs began declining in 1998, before the special effort to address the issue began, and continued to decline significantly through 2006. But whether those numbers reflect a genuine decline is a matter of debate, given that large numbers of service members have spent considerable time away on deployments and that the strengthening of sanctions for domestic violence has made some women more reluctant to report abuse.

The accuracy of the military's domestic violence data has also been questioned, by advocates, the Government Accountability Office and military officials themselves.

Last fall, in a statement released during domestic violence awareness month, Mike Hoskins, a Pentagon official, said. "We shouldn't necessarily take comfort in reduced rates of violence." He said they probably reflected "good news" but urged caution in interpreting the numbers.

Dr. Campbell, the former task force member, said the task force had recommended periodic anonymous surveys to ascertain the full extent of domestic violence. She also said that she believed the "true incidence" of domestic violence had probably increased as a result of service members returning from Iraq with combat trauma, which can exacerbate family violence.

"It's sort of like, on the one hand, they're improving the system, and on the other hand, they're stressing it," she said

Others agree, noting that wartime places a burden on the military as a whole, even on those who do not deploy to combat zones but absorb additional duties at home.

Christine Hansen, executive director of the Miles Foundation, which provides domestic violence assistance mostly to the wives of officers and senior enlisted men, said the organization's caseload had tripled since the war in Iraq began.

And John P. Galligan, a retired Army colonel who served as a military judge at Fort Hood and now represents military clients in private practice, said he, too, had seen a "substantial" increase in military domestic violence cases in his area.

"Sometimes I just sit and scratch my head," he said.

The separation of deployment, in and of itself, often causes marital strains.

"Even with a healthy marriage, there is a massive adjustment," said Anita Gorecki, a lawyer and former Army captain who represents soldiers near Fort Bragg and is married to an officer currently in Iraq. "Add on to that combat stress and injuries and sometimes it can create the perfect storm."

Some researchers draw a fairly firm connection between post-traumatic stress disorder and domestic violence. A 2006 study in The Journal of Marital and Family Therapy looked at veterans who sought marital counseling at a Veterans Affairs medical center in the Midwest between 1997 and 2003. Those given a diagnosis of PTSD were "significantly more likely to perpetrate violence toward their partners," the study found, with more than 80 percent committing at least one act of violence in the previous year, and almost half at least one severe act.

Pamela Iles, a superior court judge who was permitted by the Marines to set up a privately financed domestic violence education program at Camp Pendleton in California, views much of the domestic abuse on the base as "collateral" from the war. She sees the domestic violence committed by marines, many of them young, as a reaction to jumping back and forth between the dangers of war and the trouble at home.

"One minute you are in Baghdad waiting for a bomb to go off and the next minute you are in Burger King," Judge Iles said. "There is a lot of disorientation."

A 9-Year-Old Witness

It was a little before dawn on Feb. 20, 2006, in a bedroom in Edwardsville, Ill. Carol Trevino and her 9-year-old son, sleeping deeply after watching "Wayne's World," were startled awake by a series of booms. "What was that?" Carol Trevino asked her son.

In seconds, Sgt. Jon Trevino, her estranged husband, barged through the door, according to a police report. Mrs. Trevino had just enough time to reach for her pepper spray before he shot her five times, the last time in the head. Then he shot himself.

Their son, wide-eyed, sat in bed watching his life explode, bullet by bullet.

Few details escaped the boy's notice. His father used a silver gun and it "didn't have a wheel on it, like the cowboys used," he told the Edwardsville police. The boy could even name the precise time of his mother's death: 4:32 a.m., as the glowing clock read.

Outside in Mr. Trevino's car was the immediate motive for the murder-suicide: divorce papers, evidence of a marriage destabilized by multiple deployments to war zones and by Sergeant Trevino's own increasing instability.

T. Robert Cook, his brother-in-law, said he believed Sergeant Trevino's domestic violence was triggered by his combat trauma. "I'm 100 percent sure it was the war," said Mr. Cook, who is raising the Trevinos' son along with his wife, Sheryl Gusewell, who is Carol's sister. "I don't have any doubt their marital problems placed a burden on him, but I am quite sure that, but for the war, he would have taken a different approach. When you see people being shot every day, death is not a big thing."

Sergeant Trevino, who had endured childhood sexual abuse and a difficult first marriage, suffered psychiatric problems long before he was dispatched to war zones to perform the highly stressful job of evacuating the wounded.

And the Air Force knew it.

Air Force mental health records show that Sergeant Trevino, who was 36, had been treated twice for mental health problems before the war: once in 1995 for serious depression as his first marriage crumbled, and then in 1999 for post-traumatic stress disorder stemming from the childhood abuse and marital problems with his new wife, Carol. He was counseled and treated with medication both times.

As a result of these problems, the Air Force insisted that he secure a medical waiver for a promotion that he sought to become an aeromedical evacuation technician. And military doctors certified that he could handle the job, despite research that shows that pre-existing post-traumatic stress disorder is exacerbated in a war zone.

Col. Steven Pflanz, a senior psychiatrist in the Air Force, who was not involved in the Trevino case, said the Air Force considered the stress disorder to be treatable and therefore was willing to deploy an airman with a history of it. But the decision is not taken lightly, he said.

"It's not an exact science," he said. "You try to make your best prediction. We spend a lot of time with our customers."

In Sergeant Trevino's case, the prediction was wrong. He had trouble shaking off the carnage that he experienced so viscerally while evacuating injured service members. After one deployment to Afghanistan and two to Iraq, his mental health and his marriage deteriorated. When he returned from his second tour in Iraq, Sergeant Trevino acknowledged in a health assessment that he had "serious problems" dealing with the people he loved and that he was feeling "down, helpless, panicky or anxious."

The Air Force acted quickly. He was abruptly restricted from "special operational duty." An Air Force doctor diagnosed "acute PTSD," calling it a reaction to the war and marital problems. Sergeant Trevino began taking a cocktail of antidepressants and underwent therapy. According to doctors' notes, he did not express thoughts of homicide or suicide. By the time Hurricane Katrina hit the Gulf Coast in August 2005, he was considered well enough to be deployed domestically.

But his wife's family, which had taken him under its wing, found the once affable, quick-witted sergeant to be profoundly altered. His temper flashed unpredictably, white-hot. He acted threatened and paranoid, his behavior so erratic that he frightened his son. One late night, he took his son on a rambling drive to nowhere, ranting to the boy about his mother.

At least one time, he struck his wife. A friend gave Carol Trevino the pepper spray that she reached for the night of her murder. But she never considered his abuse serious enough to report him to the authorities.

Four days before the murder-suicide, Sergeant Trevino bought a gun.

"This is just one of those things that unfortunately happens," he wrote to his son in a suicide note. "I love you, and I know I let you down."

Justice Delayed

The Pentagon task force had one overarching recommendation: that the military work hard to effect a "culture shift" to zero tolerance for domestic violence by holding offenders accountable and by punishing criminal behavior.

There was, members believed, a core credo that needed to be attacked frontally: "this notion that the good soldier either can't be a wife beater or, if they are, that it's a temporary aberration that shouldn't interfere with them doing military service," as Dr. Campbell put it.

The way the military handled several cases involving the deaths of babies and toddlers indicates that this kind of thinking has been difficult to demolish at a time of war.

In October 2003, four months after Jose Aguilar, 24, a Marine Corps sergeant, returned from the initial invasion of Iraq, his infant son, Damien, wound up in the intensive care unit of a local hospital with bleeding in his brain and eyes.

Sergeant Aguilar, a mechanic based at Camp Lejeune in North Carolina, acknowledged to the local police that he had been rough with the 2-month-old baby, shaking Damien to stop him from squirming during a diaper change. He said that he had been abused himself as a child and that he did not mean to hurt the baby.

After the marine was charged with felony child abuse, he and his wife completed a parenting program.

The following summer, while the felony charge was pending, Sergeant Aguilar was deployed once more to Iraq, this time for nine months. His court case was delayed, which did not surprise local prosecutors.

Michael Maultsby, the assistant district attorney in Onslow County, N.C., who prosecuted Sergeant Aguilar, said that such frustrating delays in justice sometimes occur in his county, home to Camp Lejeune.

"It depends on the needs of the unit," Mr. Maultsby said. "We can't overrule them."

In April 2006, a year after Sergeant Aguilar returned from Iraq but before his felony case was resolved, Damien, who by then was 2, died of a brain injury. His father claimed that the boy had been injured by a fall in the bathtub. The medical examiner disputed that explanation. The marine was arrested, pleaded guilty to second-degree murder and felony child abuse, and was sentenced last fall to 28 to 35 years in prison.

Marine officials would not comment on individual cases. Elaine Woodhouse, a Marine Corps social services program specialist, said that "the family advocacy program does not recommend or advise deployment of a marine when domestic or felony child abuse charges are pending." Still, that decision, she said, is left to the discretion of the commanders

A conviction for domestic violence, unlike pending charges, almost always renders a service member ineligible to go to war, but that restriction has not always been considered binding, as is clear in the case of Sergeant Terrasas, who was stationed at Camp Pendleton.

One night in late December 2002, Sergeant Terrasas, drunk and angry over a telephone conversation about the looming war in Iraq, vented his anger by punching his wife, Lucia, in the face.

"He seemed to just lose it," Mrs. Terrasas told the police in Oceanside, Calif., who arrested him on misdemeanor charges.

But Sergeant Terrasas was deployed to Iraq before his case was heard. It was not until his return seven months later that he pleaded guilty, was placed on probation and was ordered to complete a 16-week batterers intervention program run by the Marine Corps.

Sergeant Terrasas attended a few classes. But the Marine Corps, facing a runaway insurgency in Iraq, pulled him out of the batterers program and shipped him off to war for a second time in early 2004.

This deployment was illegal. A 1996 law bans offenders who are convicted of domestic violence misdemeanors from carrying firearms, with no special exception for military personnel  The ban is referred to as the Lautenberg amendment after its sponsor, Senator Frank R. Lautenberg, Democrat of New Jersey.

Army and Marine regulations, formulated in response to the weapons ban, explicitly prohibit deployments for missions that require firearms, and extend the policy to felony domestic violence offenders, too. The Marine Corps would not comment on Sergeant Terrasas's deployment, citing confidentiality rules.

When Sergeant Terrasas returned from war, he completed his batterers program, said his lawyer, Philip De Massa. But his anger, tested by two tours in Iraq, still surfaced. In September 2005, when the police responded to a domestic argument, he broke down crying and told one officer that he suffered from "postwar traumatic syndrome." There is no record that he sought or received mental health help.

Nearly two weeks later, the Terrasases' 7-month-old son, Alexander, died from a powerful blow to the head. Mr. Terrasas was charged with murder. Last August, after a deal with prosecutors, he was sentenced to seven years in prison for felony child endangerment.

He never admitted to abusing his child.

When Strains on Military Families Turn Deadly The New York Times February 15, 2008 Friday Correction Appended

Broken Promises

Sgt. Erin Edwards, emboldened by a year in Iraq, returned to Texas with the courage to end her troubled marriage.

"Being apart for such a long period of time enabled her to realize she could survive without him," said Sgt. Jami Howell, 28, who was her best friend.

When Erin Edwards told her husband that she wanted a divorce after four years of marriage, he responded as she had long feared.

On June 19, 2004, he followed her to their baby sitter's house to hand her a written proposal for a custody arrangement. When she did not immediately respond, he beat her so badly that she wound up in the emergency room.

Even before the assault, William Edwards's troubles had so badly affected his performance at work that his commanding officer, Capt. Brian Novoselich, took the time to meet with him weekly to check on his welfare. After the assault, it was the captain who confined him to the base.

But William Edwards repeatedly left unescorted and often stayed with his brother, who lived across the street from Erin Edwards in Killeen. On several occasions, she alerted the police and his superiors that he was lurking.

On July 21, 2004, Erin Edwards went to court to make the temporary protection order permanent. At the hearing, William Edwards told the judge that he had enrolled in alcohol and domestic violence classes after the June assault, according to a transcript.

"I had hit rock bottom when I touched my wife, man," he said in court. "That was the worst day ever in my life. I had always told my wife that I would never touch her, ever, physically."

William Edwards also acknowledged that when the police showed up that day, he begged his wife not to press charges, saying: "Don't do this to my career. Don't do this."

Erin Edwards spoke of the effect on their children, who witnessed the assault. "Since the incident happened, all my son talks about is how his father hurt his mother, and that 'Daddy is going to kill Mommy,'" she said.

She also stated, and her husband learned for the first time, that she was transferring and moving with the children. William Edwards was "visibly upset" by this, according to Army documents turned over to the police.

The following morning, after reporting to an exercise session with other soldiers, William Edwards left the base alone one final time. After the murder-suicide, local police officers securing the scene noted that both bodies were dressed in military camouflage clothing with nameplates that said Edwards. Both were 24.

At Erin Edwards's funeral, her boss, Brig. Gen. Charles Benjamin Allen, who was killed in a helicopter crash in late 2004, eulogized the soldier with a cracking voice. More than three years later, her relatives note that not even he, with his high rank, was able to ensure that the military was doing more than taking a troubled soldier "at his word," as Mary Lou Taylor, Erin's aunt, said.

"He couldn't or failed to help her be safe," Ms. Taylor said.

William Edwards's former commanding officer, Major Novoselich, said in a recent interview that he was "shocked by the end result." Now a professor at West Point, he said he had assumed that William Edwards's immediate supervisors were monitoring him.

Near Fort Hood, Detective Brank of the Killeen police said soldiers continued to defy restrictions to the base.

"I am surprised," she said. "Fort Hood is not enforcing these orders."

The Army examined Erin Edwards's death as part of a fatality review program recommended by the Pentagon task force "to ensure no victim dies in vain."

A one-paragraph summary of the review seemed to discount the findings of the civilian police investigation. The summary noted that Erin Edwards had refused the assistance of the base's family advocacy program, while William Edwards had enrolled in it. It added that William Edwards had "appeared to comply" with his restrictions. Until the day he "eluded his military escort" and killed his wife.

URL: http://www.nytimes.com

CORRECTION-DATE: February 19, 2008

CORRECTION:

A photograph on Friday with an article about domestic violence among military personnel carried an incomplete credit. The photograph of Sgt. Jose Aguilar, who was deployed to Iraq despite a pending charge of child abuse, was provided by the Daily News/FENC, Jacksonville, N.C. -- not just The Daily News, a Freedom Eastern North Carolina newspaper.

GRAPHIC: PHOTOS: Sgt. Erin Edwards, shown in Saddam Hussein's hiding hole, was killed by her husband, a fellow soldier. Both served in Iraq. (pg. A1)
IN IRAQ: Sgt. Erin Edwards with Iraqi civilians in 2003, during her yearlong deployment (pg. A14)
A VETERAN'S GRAVE: Erin Edwards, who was fatally shot by her husband in 2004, was buried in Clearfield, Pa. (PHOTOGRAPH BY FRED R. CONRAD/THE NEW YORK TIMES) (pg. A14)

LOAD-DATE: February 16, 2008

EXHIBIT 3

FOCUS - 5 of 11 DOCUMENTS

Copyright 2008 The Houston Chronicle Publishing Company
All Rights Reserved
The Houston Chronicle

October 4, 2008 Saturday
3 STAR R.O. EDITION

**SECTION:** A; Pg. 12

**LENGTH:** 495 words

**HEADLINE:** Soldier's death renews criticism of Army;
Critics say it's not doing enough to address issue of domestic violence

**BYLINE:** ESTES THOMPSON, Associated Press

**DATELINE:** RALEIGH, N.C.

**BODY:**

RALEIGH, N.C. - For the third time in four months, a female soldier based at Fort Bragg is dead, and a husband or lover is charged with murder - leading critics to demand the home base of the Army's elite soldiers exert "control over their troops" and address domestic violence.

Police on Friday charged Sgt. Richard Smith, 26, and Pfc. Mathew Kvapil, 18, with first-degree murder and conspiracy to commit murder only days after Smith's wife was found stabbed to death.

Authorities said Smith hired Kvapil to kill his wife - 29-year-old Sgt. Christina E. Smith - as the couple walked together Tuesday evening in their off-base Fayetteville neighborhood.

"The number of military women being killed in North Carolina in the last eight months is horrific," said retired Army Col. Ann Wright, a former State Department diplomat who once served at Fort Bragg and is now a peace activist. "The Marine Corps and the Army need to very quickly show leadership and control over their troops."

Smith's death follows the slayings of Spc. Megan Touma, 23, and 2nd Lt. Holley Wimunc, 24. It also comes less than a year after Marine Cpl. Maria Lauterbach, stationed at North Carolina's Camp Lejeune, was found dead.

In all four cases, authorities have charged a fellow soldier or Marine involved in a relationship with the victim with murder.

"For me, I was thinking, `No, gosh, not another one,' " said Fayetteville police spokeswoman Theresa Chance. "We have domestic violence issues like every other city. Obviously, the military seems to be targeted lately "

The Army says the rate of domestic violence in the service is no worse than among civilian families, but critics argue there is a lack of comprehensive data.

The Connecticut-based Miles Foundation, which provides domestic-violence assistance to military wives, has said its caseload has more than quadrupled during wars in Iraq and Afghanistan.

Soldier's death renews criticism of Army; Critics say it's not doing enough to address issue of domestic violence The Houston Chronicle October 4, 2008 Saturday

"How many more deaths is it going to take until they own up that there's a problem?" said Judy Lowe, who helped found the Fayetteville-based Coalition to End Domestic Violence and Sexual Assault in the Military.

But officials at Fort Bragg said the deaths are unrelated, regardless of any tragic similarities.

Carol Darby, a spokeswoman for the Army's Special Operations Command, said the Army had no reason to be "overly concerned for (the) personal safety of female soldiers."

She pointed to programs and counseling offered by the Army aimed at assisting soldiers and family members through family, personal, financial and other issues.

"There are no indicators that we are aware of that pinpoints a trend; this is an anomaly," Darby added.

Smith and Kvapil face initial court appearances Monday. The military said the Army Criminal Investigation Division at Fort Bragg also was investigating.

Darby said Richard Smith, of Denton, Texas, had returned in June 2007 from 10 months in Iraq.

Kvapil, of Santee, Calif., joined the Army in 2007. Christina Smith, of Mount Orab, Ohio, enlisted in 2005.

GRAPHIC: Photos: 1. LATEST CASE: Sgt. Christina Smith was killed Tuesday while walking with her husband.; 2. IN JUNE: Spc. Megan Touma's body was found in a Fayetteville, N.C., motel room.; 3. IN JULY: 2nd Lt. Holley Wimunc's remains were found three days after she went missing.
U.S. ARMY PHOTOS

LOAD-DATE: October 6, 2008

EXHIBIT 4

Copyright 2008 Los Angeles Times
All Rights Reserved
Los Angeles Times

September 3. 2008 Wednesday
Home Edition

SECTION: CALIFORNIA; Metro Desk; Part B; Pg  1

LENGTH: 931 words

HEADLINE: Family tells of alleged killer's post-Iraq mental troubles;
Wounded vet accused of fatally beating his girlfriend came home with severe problems, his brothers say.

BYLINE: Paloma Esquivel, Christine Hanley, Times Staff Writers

BODY:

John Wylie Needham was known as an easygoing surfer who liked to paint and play guitar and bounced from job to job. He knew he needed direction in life. So two years ago he joined the Army and eventually shipped off to Iraq.

This, he thought, would make his family proud.

Late Monday night, when Orange County sheriff's deputies responded to a complaint about an argument at Needham's San Clemente condo, the 25-year-old veteran answered the door naked. He was belligerent and needed to be subdued with a Taser, deputies said. And in a bedroom they found his 19-year-old girlfriend, Jacqwelyn Joann Villagomez, severely beaten.

By Tuesday morning, Villagomez was dead and Needham was charged with murder and was being held in lieu of $1-million bail.

The alleged slaying capped a tumultuous period during which Needham was wounded in combat and returned home late last year with severe mental problems, his family said. He was still in pain from the shrapnel in his legs and back. He struggled with nightmares that left him screaming. He had been hospitalized and medicated, had consulted with therapists and had reached out for help.

But it was Needham himself who appeared to know how fast he was spiraling downward.

"I'm falling apart by the seams it seems the days here bleed into each other I have to find the will to live," he wrote in a rambling posting on his MySpace page. "These walls are caving in my despair wraps me in its web, I feel I'm sinking in, throw me a lifesaver throw me a life worth living."

Needham's family knew he was struggling. But never did they foresee this.

"I can't see him doing this," said his brother Mike Needham. "I know he went through a lot in Iraq. But this is just not him. . . . You can't believe how happy he was until he came back from Iraq."

Needham served in Iraq last year and was awarded a Purple Heart for his combat injury, said Army spokesman

Family tells of alleged killer's post-Iraq mental troubles; Wounded vet accused of fatally beating his girlfriend came home with severe problems, his brothers say. Los Angeles Times September 3,

Master Sgt. Keith O'Donnell. He was discharged for unspecified medical reasons. O'Donnell said. Additional details about his service were not immediately available.

Villagomez, known to friends as Jacque, was born in the Central Valley. She was raised in Turlock by her grandmother from the age of 6, after her mother died and her father moved to Guam, friends said. She ran track at Pitman High School before moving with a boyfriend to Orange County, where she graduated from El Toro High School in Lake Forest.

Thad Moren, her track coach at Pitman, said Villagomez was a very good student and that she still holds the high school's records for the 100- and 300-meter hurdles. She was heavily involved in the drama program, winning parts in many school plays, Moren said. She had moved out of her grandmother's home and was living with a teammate's family when she made the decision to leave Turlock.

"She was a bright young lady," Moren said. "When she left, she seemed like she was on the right track. We hoped everything would turn out OK."

Slim and toned from her running days, Villagomez dreamed of being a model, friends said. On a local modeling website she wrote:

"I have a passion for modeling. I guess it runs in the family, my mom was an amazing model. I have done small fashion shows, more when I was younger but I'm willing to learn and grow in the business!"

Needham met Villagomez a few months ago at a mutual acquaintance's birthday party. His family described their relationship as turbulent and said he had been trying to break up with Villagomez for several weeks.

Another brother, Matt, told KTLA-TV Channel 5 that the relationship was putting additional strain on his brother.

"I knew that if they didn't break up the proper way that, you know, it could be a bad breakup. But no one figures a bad breakup is like this," he said. "I never saw this coming. But I'll tell you what, with my brother . . . the mental state he's in since Iraq, nothing would surprise me."

Erik Krecu, 20, who said he was the victim's ex-boyfriend, said she called him Monday evening to say Needham had tried to choke her. He said she told him Needham had become violent and aggressive in recent days. At one point, she used pepper spray against him, he said.

"We had no idea it would have turned out like this or we would have come and got her," said Krecu's mother, Debbie Krecu.

Authorities said the violence may have erupted after another woman arrived at Needham's condo and became involved in a fight with Villagomez. Officials said that Needham apparently broke up the fight and that the visitor called 911 after she left the residence.

Stephen Singleton. 38, a neighbor of Needham, said he met Needham and Villagomez about a month ago as they lounged by the pool. They were friendly and seemed extremely happy, he said. He said Needham told him he had just come back from Iraq and was taking pain medication for an injury he suffered there.

Needham told him he was trying to "live each day one at a time." Singleton said. "He wasn't complaining about his pain. He seemed very happy."

On Tuesday, friends gathered outside the condominium complex where Needham lived with Villagomez, his father and his brothers. Mourners created a makeshift memorial to the victim, with candles and flowers beneath yellow crime scene tape.

Family tells of alleged killer's post-Iraq mental troubles; Wounded vet accused of fatally beating his girlfriend came home with severe problems. his brothers say. Los Angeles Times September 3,

"He's been no good since he got back, I'll be honest," Matt Needham said. "I mean, he's my brother, we grew up in the same crib together, I love him like no one else, and it's sad to know the person who means the most to me. to completely write them off because they're crazy."

--

paloma.esquivel@latimes.com

christine.hanley@latimes.com

Times staff writer Mike Anton contributed to this report.

**GRAPHIC:** PHOTO: MEMORIAL: Silvia and Erik Krecu light candles for Jacqwelyn Joann Villagomez in San Clemente. Erik said he was the victim's former boyfriend and that she had told him that John Needham had become violent and aggressive in recent days.   PHOTOGRAPHER:Karen Tapia-Andersen Los Angeles Times PHOTO: ACCUSED: John Wiley Needham, 25, said on his MySpace page: "I'm falling apart by the seams."
PHOTOGRAPHER: PHOTO: MOURNING: The Krecu family hugs outside a San Clemente condominium after learning of the death of their friend. Debbie Krecu said: "We had no idea it would have turned out like this or we would have come and got her."  PHOTOGRAPHER: Karen Tapia-Andersen Los Angeles Times PHOTO: INQUIRY: An investigator searches for clues near the condo where Villagomez was found severely beaten and unconscious after deputies responded to a complaint about an argument.  PHOTOGRAPHER: Karen Tapia-Andersen Los Angeles Times
**GRAPHIC:** MAP: Fatal beating  CREDIT:Los Angeles Times

**LOAD-DATE:** September 3, 2008

# Exhibit 2



**DEPARTMENT OF THE ARMY**
FREEDOM OF INFORMATION AND PRIVACY DIVISION
7701 TELEGRAPH ROAD, SUITE 144
ALEXANDRIA, VA  22315-3905
January 7, 2009

U.S. Army Freedom of Information
Office (FOI/PA 09-0174)

Ms. Melanie Sloan
CREW
1400 Eye Street, NW, Suite 450
Washington. DC  20005

Dear Ms. Sloan:

This is in response to your Freedom of Information request dated November 25, 2008, for all records relating to U. S. Army's policies concerning soldiers accused of acts of domestic violence charges.  Your request was received in this office on November 26, 2008.  Your request is being processed in accordance with Title 5 United States Code 552, The Freedom of Information Act.

Please be advised that this office serves as the referral point and policy office for the Department of the Army Freedom of Information and Privacy Act entities and is not a repository for documents maintained by the Department of the Army.  Requests for information and documents under the purview of the Army are referred to the proponent agency for appropriate handling, and the proponent of the requested records in accordance with Army Regulation 25-55, The Army Freedom of Information Act Program.

We have referred your request and documents to the following activities for action and direct response to you provided the information exist.

U.S. Army Human Resources Command- St. Louis
ATTN: AHRC-FOIA-STL
1 Reserve Way
St. Louis, MO  63132-5200
(314) 592-0847

Office of the Judge Advocate General
ATTN: DAJA-AL
1777 North Kent Street, 10th Floor
Rosslyn, VA  22209
(703) 588-6762

U.S. Army Crime Records Center
ATTN: CICR-FP
6010 6TH Street, Bldg #1465
Fort Belvoir, VA  22060-5585
(703) 806-0468

National Personnel Records Center
(Military Personnel Records)
9700 Page Avenue
St. Louis. MO  63132-5100

Directorate of Human Resources
ATTN: IMSE-BRG-HRA-F (FOIA/PA)
2175 Reilly Road, Stop A
Fort Bragg, NC  28310-3642
(910) 907-3642

Directorate of Human Resources
ATTN: FOIA/PA FOIA Office
212 Custer Ave., Room 218
Fort Riley, KS  66442
(785) 239-3759

If you have any questions regarding the status of your request, you should contact the activities at the address or telephone number above.   If this office can be of further assistance, please contact us at (703) 428-6206.

Sincerely,

Robert Dickerson
Chief, U.S. Army Freedom of Information
and Privacy Office

# Exhibit 3



**DEPARTMENT OF THE ARMY**
US ARMY INSTALLATION MANAGEMENT COMMAND
HEADQUARTERS, UNITED STATES ARMY GARRISON. FT BRAGG
2175 REILLY ROAD, STOP A
FORT BRAGG, NORTH CAROLINA 28310-5000

REPLY TO
ATTENTION OF

January 12, 2009

**Freedom of Information Act Office**

Ms. Melanie Sloan
CREW
1400 Eye Street, NW, Suite 450
Washington, DC 20005

Dear Ms. Sloan:

This is in response to your Freedom of Information Act (FOIA) request referred to this office by the Army FOIA office. We received your request January 12, 2009 and have assigned it FOIA Case #40-09. You've requested records pertaining to Case Review Committee (CRC) for domestic violence complaints and treatment of those soldiers alleged to have committed such offenses.

The documents you are requesting falls under the purview of the Womack Army Medical Center Freedom of Information (FOIA) office. Therefore, your request has been referred to:

Womack Army Medical Center
Freedom of Information Act (FOIA) Office
ATTN: MCXC-IM-AS
Fort Bragg, NC 28310-5000

They will make release determination and reply directly to you. If you have any questions concerning this referral, please reply to the address above or call Mr. Douglas E. Moore, Directorate of Human Resources (FOIA Coordinator), at (910) 907-3642, and refer to the FOIA Case #40-09.

Sincerely,

JOHN L. DURDEN, JR.
Administrative Services Officer

# Exhibit 4



**DEPARTMENT OF THE ARMY**
U. S. ARMY CRIMINAL INVESTIGATION COMMAND
U.S. ARMY CRIME RECORDS CENTER
6010 6TH STREET
FORT BELVOIR, VIRGINIA 22060-5508

REPLY TO
ATTENTION OF

FEB 0 3 2009

FA09-0868

Ms. Melanie Sloan
Citizens for Responsibility and Ethics in Washington
1400 Eye Street, N.W. Suite 450
Washington, DC 20005

Dear Ms Sloan:

This is an interim response to your request for US Army Criminal Investigation Command records. Your request was received on January 26, 2008. Your request has been assigned the case number indicated above.

It is our policy that each request receives prompt attention, and every effort is made to treat all requesters equally. This office receives hundreds of FOIA requests annually on behalf of the U.S. Army Criminal Investigation Command. DOD FOIA Regulation 5400.7-R at C1.5.4.2 and C1.5.4.3 acknowledges the reality of the situation of large volumes of requests and establishes a queuing concept, based on general fairness to the public at large. Consequently, the only fair way to address all of these requests is to work them on a first-in, first-out, easy to hard basis (whether the case is easy or difficult to complete). The actual processing time could take approximately 30 to 60 days depending upon its complexity, whether it involves sensitive records, voluminous records, extensive searches, consultation with other agencies and our administrative workload. We hope that you can bear with us and understand our problem with volumes of requests. We do regret this delay and any inconvenience it may bring you. We will act on the request as soon as possible and respond directly to you.

Any questions regarding this response should be provided in writing to the Director, U.S. Army Crime Records Center, Attention: FOIA/PA Division, 6010 6th Street, Fort Belvoir, Virginia 22060-5585 or you can call 1-800-511-4786. Please reference the above case number with your correspondence.

Sincerely,

Phillip J. McGuire
Director, Crime Records Center

Printed on    Recycled Paper

# Exhibit 5



DEPARTMENT OF THE ARMY
OFFICE OF THE JUDGE ADVOCATE GENERAL
1777 North Kent Street
Rosslyn, Virginia 22209-2194

REPLY TO
ATTENTION OF:

February 13, 2009

Criminal Law Division

Ms. Melanie Sloan
Citizens for Responsibility and Ethics in Washington
1400 Eye Street., N.W., Suite 450
Washington, D.C. 20004

Dear Ms. Sloan:

I am responding, in part, to your November 25, 2008 Freedom of Information Act (FOIA) request wherein you requested documents concerning domestic violence in the Army.

Army policy concerning domestic violence is generally published in Army Regulation 608-18, The Army Family Advocacy Program (30 October 2007). You can view, print and copy that regulation at http://www.apd.army.mil/pdffiles/r608_18.pdf. This office has no other responsive records. However, your FOIA request has also been referred to the following offices that may have responsive documents:

Office of the Clerk of Court
U.S. Army Judiciary
ATTN: JALS-CCO
901 North Stuart Street, Suite 1200
Arlington, Virginia 22203-1837, and

Commander
U.S. Army Family and Morale, Welfare and Recreation Command
ATTN: FOIA Officer (5th Floor)
4700 King Street
Alexandria, VA 22302-4415.

This decision is made on behalf of Lieutenant General Scott C. Black, The Judge Advocate General. You may appeal it, within sixty days of this letter, through this office to the Secretary of the Army, Attention: Office of the General Counsel, 104 Army Pentagon, Room 3C546, Washington, D.C. 20310-0104.

Sincerely,

Charles N. Pede
Colonel, U.S. Army
Chief, Criminal Law Division

# Exhibit 6

**From:** Chapman, Mary B Ms CIV USA OTJAG (mary.chapman@us.army.mil)
**To:** infoprivacylaw@yahoo.com
**Date:** Wed, February 18, 2009 3:47:44 PM
**Subject:** CREW Request - FOIA/PA-09-0174

ATTN: Scot Hodes:

Per our conversation, attached is the Specification List from ACMIS (Army Court-Martial Information System). This system is maintained in the Office of the Clerk of Court, US Army Judiciary, Arlington, Virginia.

Please mark a "Y" in the "include" column for the Specifications that you request to be included in the report and return the list to me via e-mail.

Reference item #3 in your 25 Nov 2008 request, the query will include the total number of referred specifications; findings specifications; and, the total number of cases that received confinement in the sentence, based on the list you return above.

Reference item #4, the query will include the total number of dismissals (in the case of an officer), dishonorable discharges, and bad-conduct discharges.

Please call if you have any further questions.

Sincerely,

Mary B. Chapman
Deputy Clerk of Court
U.S. Army Judiciary
OFC: (703) 588-7920 (DSN 425)
FAX: (703) 696-8777 (DSN 426)
Mary.Chapman@hqda.army.mil

# Exhibit 7

**From:** Scott Hodes (infoprivacylaw@yahoo.com)
**To:** Chapman, Mary B Ms CIV USA OTJAG
**Date:** Tue, February 24, 2009 11:27:34 AM
**Cc:** Anne Weismann
**Subject:** Re: CREW Request - FOIA/PA-09-0174

Ms. Chapman:

Attached is the specification list with Y marked for the specifications CREW seeks to be included in the report.

I note that you have stated that Reference item #3 in your 25 Nov 2008 request, the query will include the total number of referred specifications; findings specifications;
and, the total number of cases that received confinement in the sentence, based on the list you return above.
Additionally, Reference item #4, the query will include the total number of dismissals (in the case of an officer), dishonorable discharges, and bad-conduct discharges

Scott Hodes

Scott's Website: www.infoprivacylaw.com
Scott's blog: http://thefoiablog.typepad.com


**From:** "Chapman, Mary B Ms CIV USA OTJAG" <mary.chapman@us.army.mil>
**To:** infoprivacylaw@yahoo.com
**Sent:** Wednesday, February 18, 2009 3:47:44 PM
**Subject:** CREW Request - FOIA/PA-09-0174

ATTN: Scot Hodes:

Per our conversation, attached is the Specification List from ACMIS (Army Court-Martial Information System). This system is maintained in the Office of the Clerk of Court, US Army Judiciary, Arlington, Virginia.

Please mark a "Y" in the "include" column for the Specifications that you request to be included in the report and return the list to me via e-mail.

Reference item #3 in your 25 Nov 2008 request, the query will include the total number of referred specifications; findings specifications; and, the total number of cases that received confinement in the sentence, based on the list you return above.

Reference item #4, the query will include the total number of dismissals (in the case of an officer), dishonorable discharges, and bad-conduct discharges.

Please call if you have any further questions.

Sincerely,

Mary B. Chapman
Deputy Clerk of Court
U.S. Army Judiciary
OFC: (703) 588-7920 (DSN 425)
FAX: (703) 696-8777 (DSN 426)
Mary.Chapman@hqda.army.mil

# Exhibit 8

**From:** Chapman, Mary B Ms CIV USA OTJAG (mary.chapman@us.army.mil)
**To:** Scott Hodes
**Date:** Wed, March 4, 2009 9:37:41 AM
**Subject:** Request for statistical report.

Dear Mr. Hodes:

Please find attached the requested report.  When you open the
attachment, please note that the specifications worksheet is appended to
the report at the bottom tab.

Sincerely,

Mary B. Chapman
Deputy Clerk of Court
U.S. Army Judiciary
OFC: (703) 588-7920 (DSN 425)
FAX: (703) 696-8777 (DSN 426)
Mary.Chapman@hqda.army.mil


-----Original Message-----
From: Scott Hodes [mailto:infoprivacylaw@yahoo.com]
Sent: Tuesday, February 24, 2009 11:28 AM
To: Chapman, Mary B Ms CIV USA OTJAG
Cc: Anne Weismann
Subject: Re: CREW Request - FOIA/PA-09-0174

Ms. Chapman:

Attached is the specification list with Y marked for the specifications
CREW seeks to be included in the report.

I note that you have stated that Reference item #3 in your 25 Nov 2008
request, the query will include the total number of referred
specifications; findings specifications; and, the total number of cases
that received confinement in the sentence, based on the list you return
above.  Additionally, Reference item #4, the query will include the
total number of dismissals (in the case of an officer), dishonorable
discharges, and bad-conduct discharges

Scott Hodes

Scott's Website: www.infoprivacylaw.com
Scott's blog: http://thefoiablog.typepad.com

_____

From: "Chapman, Mary B Ms CIV USA OTJAG" <mary.chapman@us.army.mil>
To: infoprivacylaw@yahoo.com

Sent: Wednesday, February 18, 2009 3:47:44 PM
Subject: CREW Request - FOIA/PA-09-0174

ATTN: Scot Hodes:

Per our conversation, attached is the Specification List from ACMIS
(Army Court-Martial Information System). This system is maintained in
the Office of the Clerk of Court, US Army Judiciary, Arlington,
Virginia.

Please mark a "Y" in the "include" column for the Specifications that
you request to be included in the report and return the list to me via
e-mail.

Reference item #3 in your 25 Nov 2008 request, the query will include
the total number of referred specifications; findings specifications;
and, the total number of cases that received confinement in the
sentence, based on the list you return above.

Reference item #4, the query will include the total number of dismissals
(in the case of an officer), dishonorable discharges, and bad-conduct
discharges.

Please call if you have any further questions.

Sincerely,

Mary B. Chapman
Deputy Clerk of Court
U.S. Army Judiciary
OFC: (703) 588-7920 (DSN 425)
FAX: (703) 696-8777 (DSN 426)
Mary.Chapman@hqda.army.mil

# U.S. ARMY JUDICIARY
## OFFICE OF THE CLERK OF COURT

Court-martial statistics on crimes against accused's dependents
for specific specifications [as selected and requested under FOIA] by CREW
(Citizens for Responsibility & Ethics in Washington)
*The crimes, as defined by CREW, are listed in the Specifications worksheet appended to this report.*

|  | Cases |
|---|---|
| Arraigned not tried | 59 |
| Tried to completion | 471 |
| Convicted | 406 |
| Confinement adjudged | 369 |
| Discharge adjudged | 327 |

# Exhibit 9

 **National Personnel Records Center**

Military Personnel Records, *9700 Page Avenue St. Louis, Missouri 63132-5100*

March 6, 2009

MELANIE SLOAN
CITIZENS FOR RESPONSIBILITY
AND ETHICS IN WASHINGTON
1400 EYE ST NW, SUITE 450
WASHINGTON, DC 20005

RE:          Request Number:  1-5597758782

Dear Ms Sloan:

Thank you for contacting the National Personnel Records Center. The NPRC is the physical custodian of the military records of former members of the U.S. Armed Forces and does not have jurisdiction over Department of the Army policy matters. Therefore, we are referring your inquiry U.S. Army Human Resources Command. We regret that we cannot be of direct assistance; however, you may expect a response from the office shown below.

> **Commander**
> **U.S. Army Human Resources Command**
> **Attn: AHRC-CC-B**
> **One Reserve Way**
> **St. Louis, MO 63132-5200**

If you have questions or comments regarding this response, you may contact us at 314-801-0800 or by mail at the address shown in the letterhead above. If you contact us, please reference the Request Number listed above. If you are a veteran, or a deceased veteran's next of kin, please consider submitting your future requests online by visiting us at http://vetrecs.archives.gov.

Sincerely,

**We Value Our**
**Veterans' Privacy**
*Let us know if we have*
*failed to protect it.*

DAWN M. PEDERSEN
Archives Technician (4A)

# Exhibit 10

From: 'Hindman, Dorothy Ms CIV USA IMCOM FMWRC'
To:
Sent: Tue Oct 20 11:58
Subject: Fwd: FW: FOIA request FA-09-0019, CREW (UNCLASSIFIED)


Mr. Hodes, This is an update to your FOIA request. Please see the email below and attachments.


/VR/
Ms. Dorothy Hindman
Ms. Dorothy Hindman
HQ IMCOM Freedom of Information Act Officer
Office: (703) 275-5193

Department of the Army
HQ Installation Management Command
Freedom of Information Act Office
Attn: IMZA-FOIA(PR)
5285 Shawnee Road, 6th Floor, SU 610
Poplar Run Office Park
Alexandria, VA 22312-4415
FOIA Telephone number: (703) 275-5146
Fax: (703) 275-5230
Email address: ARMYNCFOIA@CONUS.ARMY

Freedom of Information Act (FOIA)/Privacy Act (PA)/Procurement Integrity Act Confidentiality
Notice-For Official Use Only. This transmission and or the documents accompanying it may
contain sensitive information subject to the FOIA/Privacy/Procurement Integrity Acts. Unless
you are the intended recipient, or authorized to receive for the intended recipient, you may not
read, print, retain, use, copy, distribute or disclose to anyone the message or any information
contained in the message as it is prohibited by Federal Law. If you have received this
transmission (email) in error, please notify the sender immediately by reply email or by calling
(703) 275-5193, and destroy all copies of the original message (including any attachments).


-----Original Message-----
From: Hindman, Dorothy Ms CIV USA IMCOM FMWRC
Sent: Friday, October 16, 2009 1:44 PM
To: Hindman, Dorothy Ms CIV USA IMCOM FMWRC; Peterson, John P Mr CIV USA
MEDCOM HQ; ben.clark1@us.army.mil
Subject: RE: FOIA request FA-09-0019, CREW (UNCLASSIFIED)

LTC Clark, I forwarded this referral yesterday to MEDCOM. Please let me know if this was part
of the response from your office to Crew. If this is another FOIA request, then MEDCOM need
to respond to this request as well.

/VR/
Ms. Dorothy Hindman
Ms. Dorothy Hindman
HQ IMCOM Freedom of Information Act Officer
Office: (703) 275-5193

Department of the Army
HQ Installation Management Command
Freedom of Information Act Office
Attn: IMZA-FOIA(PR)
5285 Shawnee Road, 6th Floor, SU 610
Poplar Run Office Park
Alexandria, VA 22312-4415
FOIA Telephone number: (703) 275-5146
Fax: (703) 275-5230
Email address: ARMYNCFOIA@CONUS.ARMY

Freedom of Information Act (FOIA)/Privacy Act (PA)/Procurement Integrity Act Confidentiality Notice-For Official Use Only. This transmission and or the documents accompanying it may contain sensitive information subject to the FOIA/Privacy/Procurement Integrity Acts. Unless you are the intended recipient, or authorized to receive for the intended recipient, you may not read, print, retain, use, copy, distribute or disclose to anyone the message or any information contained in the message as it is prohibited by Federal Law. If you have received this transmission (email) in error, please notify the sender immediately by reply email or by calling (703) 275-5193, and destroy all copies of the original message (including any attachments).

-----Original Message-----
From: Hindman, Dorothy Ms CIV USA IMCOM FMWRC
Sent: Thursday, October 15, 2009 3:22 PM
To: 'Peterson, John P Mr CIV USA MEDCOM HQ'
Subject: FW: FOIA request FA-09-0019, CREW (UNCLASSIFIED)

Mr. Peterson, attached is the referral letter to your office to directly reply to the requester, Scott Hodes for CREW.

/VR/
Ms. Dorothy Hindman
Ms. Dorothy Hindman
HQ IMCOM Freedom of Information Act Officer
Office: (703) 275-5193

Department of the Army
HQ Installation Management Command

Freedom of Information Act Office
Attn: IMZA-FOIA(PR)
5285 Shawnee Road, 6th Floor, SU 610
Poplar Run Office Park
Alexandria, VA 22312-4415
FOIA Telephone number: (703) 275-5146
Fax: (703) 275-5230
Email address: ARMYNCFOIA@CONUS.ARMY

Freedom of Information Act (FOIA)/Privacy Act (PA)/Procurement Integrity Act Confidentiality
Notice-For Official Use Only. This transmission and or the documents accompanying it may
contain sensitive information subject to the FOIA/Privacy/Procurement Integrity Acts. Unless
you are the intended recipient, or authorized to receive for the intended recipient, you may not
read, print, retain, use, copy, distribute or disclose to anyone the message or any information
contained in the message as it is prohibited by Federal Law. If you have received this
transmission (email) in error, please notify the sender immediately by reply email or by calling
(703) 275-5193, and destroy all copies of the original message (including any attachments).


-----Original Message-----
From: Peterson, John P Mr CIV USA MEDCOM HQ
[john.peterson1@amedd.army.mil',',',',")">john.peterson1@amedd.army.mil]
Sent: Wednesday, October 14, 2009 6:16 PM
To: Robichaux, Rene J Dr CIV USA MEDCOM HQ; Hindman, Dorothy Ms CIV USA IMCOM
FMWRC
Cc: Tippy, Margaret Ms CIV USA MEDCOM HQ; Cavazos, Jaime Mr CIV USA MEDCOM
HQ
Subject: RE: FOIA request FA-09-0019, CREW (UNCLASSIFIED)

Classification: UNCLASSIFIED
Caveats: NONE

Dr. Robichaux,

Ms. Hindman,

This request was received and processed earlier.

At the time of CREW's request there was a similar request from CBS news specifically for the
following installations:
Fort Hood, Fort Lewis, Fort Bragg, Fort Carson, Fort Leonard Wood and Fort Drum.

Each request was referred to the Installation Management Command. There was heavy
Installation PAO/FOIA involvement.

A consolidated response to the requests was coordinated through LTC Ben Clark, Sr., Deputy

Director, Family Programs, HQDA Family Advocacy Program Manager, Family MWR
Command, 703-681-7393, who had release authority for the information.

I hope this is of assistance.

Jpp

John P Peterson
Chief, Freedom of Information/
Privacy Act Office
HQ, U.S. Army Medical Command
COMM: 210-221-7826

-----Original Message-----
From: Robichaux, Rene J Dr CIV USA MEDCOM HQ
Sent: Wednesday, October 14, 2009 4:23 PM
To: Hindman, Dorothy Ms CIV USA IMCOM FMWRC
Cc: Peterson, John P Mr CIV USA MEDCOM HQ
Subject: FW: FOIA request FA-09-0019, CREW (UNCLASSIFIED)

Classification: UNCLASSIFIED
Caveats: NONE

Ms. Hindman,
I have included Mr. Peterson on this email. He is the FOIA officer for the MEDCOM and can
respond to the part of the request (#19) that relates records belonging to the AMEDD. Generally
speaking, the information they are requesting is HIPPA protected information and would not be
releasable without the consent of the individuals that the records pertain to.
Rene

RENÉ J. ROBICHAUX, Ph.D.,LCSW
SOCIAL WORK PROGRAMS MANAGER
BEHAVIORAL HEALTH DIVISION
US ARMY MEDICAL COMMAND
(210) 221-7046


-----Original Message-----
From: Hindman, Dorothy Ms CIV USA IMCOM FMWRC
[Dorothy.Hindman@us.army.mil',",",")">Dorothy.Hindman@us.army.mil]
Sent: Wednesday, October 14, 2009 1:47 PM
To: Robichaux, Rene J Dr CIV USA MEDCOM HQ
Subject: FW: FOIA request FA-09-0019, CREW


Mr Robichaux, I have provided a copy of a FOIA request seeking records involving domestic

violence and Soldiers. Please let me know if you are one of the owners of records that the CREW requests. I need to know soonest. Thanks

/VR/
Ms. Dorothy Hindman
Ms. Dorothy Hindman
HQ IMCOM Freedom of Information Act Officer
Office: (703) 275-5193

Department of the Army
HQ Installation Management Command
Freedom of Information Act Office
Attn: IMZA-FOIA(PR)
5285 Shawnee Road, 6th Floor, SU 610
Poplar Run Office Park
Alexandria, VA 22312-4415
FOIA Telephone number: (703) 275-5146
Fax: (703) 275-5230
Email address: ARMYNCFOIA@CONUS.ARMY

Freedom of Information Act (FOIA)/Privacy Act (PA)/Procurement Integrity Act Confidentiality Notice-For Official Use Only. This transmission and or the documents accompanying it may contain sensitive information subject to the FOIA/Privacy/Procurement Integrity Acts. Unless you are the intended recipient, or authorized to receive for the intended recipient, you may not read, print, retain, use, copy, distribute or disclose to anyone the message or any information contained in the message as it is prohibited by Federal Law. If you have received this transmission (email) in error, please notify the sender immediately by reply email or by calling (703) 275-5193, and destroy all copies of the original message (including any attachments).


-----Original Message-----
From: Hindman, Dorothy Ms CIV USA IMCOM FMWRC
Sent: Wednesday, October 14, 2009 2:42 PM
To: 'tamika.leach@us.army.mil'
Subject: FOIA request FA-09-0019, CREW

Please review the FOIA request (attached) to determine that your organization is the owner of records that the requester seeks. Let me know soonest so that I can make a referral. Thank you.


/VR/
Ms. Dorothy Hindman
Ms. Dorothy Hindman
HQ IMCOM Freedom of Information Act Officer
Office: (703) 275-5193

Department of the Army
HQ Installation Management Command
Freedom of Information Act Office
Attn: IMZA-FOIA(PR)
5285 Shawnee Road, 6th Floor, SU 610
Poplar Run Office Park
Alexandria, VA 22312-4415
FOIA Telephone number: (703) 275-5146
Fax: (703) 275-5230
Email address: ARMYNCFOIA@CONUS.ARMY

Freedom of Information Act (FOIA)/Privacy Act (PA)/Procurement Integrity Act Confidentiality
Notice-For Official Use Only. This transmission and or the documents accompanying it may
contain sensitive information subject to the FOIA/Privacy/Procurement Integrity Acts. Unless
you are the intended recipient, or authorized to receive for the intended recipient, you may not
read, print, retain, use, copy, distribute or disclose to anyone the message or any information
contained in the message as it is prohibited by Federal Law. If you have received this
transmission (email) in error, please notify the sender immediately by reply email or by calling
(703) 275-5193, and destroy all copies of the original message (including any attachments).


Classification: UNCLASSIFIED
Caveats: NONE

Classification: UNCLASSIFIED
Caveats: NONE



**DEPARTMENT OF THE ARMY**
US ARMY INSTALLATION MANAGEMENT COMMAND
600 ARMY PENTAGON
WASHINGTON, DC 20310-0600

REPLY TO: HQ Installation Management Command                                     October 7, 2009
Freedom of Information Act Office
5285 Shawnee Road
Poplar Run Office Park, Suite 610
Alexandria, VA 22312
ATTENTION OF: Dorothy Hindman

MEMORANDUM FOR COMMANDER, DEPARTMENT OF ARMY, U.S. MEDICAL
COMMAND, FREEDOM OF INFORMATION/PRIVACY ACT OFFICE, ATTN:MCP,
1216 STANLEY ROAD

Subject:  Referral of Freedom of Information Act Request FA-09-0019 (HODES)

1.  On March 2, 2009, this Headquarters Installation Management Command
(HQIMCOM) received a request from Melanie Sloan, Director (Enclosure), for various
Army policies and records on soldier's domestic violence.  In March the requester sent
letter changing the point of contact to Mr. Scott Hodes.  Currently, the information as to
custodians of records were only identified today.

2.  Review of the requested records revealed that this command is only responsible for
Army Regulation 608-18, Army Family Advocacy Program and all remaining records
belong to other Army Organizations and Medical Command, Ft. Sam Houston.

3.  Records in this Command revealed that the requested information or records are
with your Command.  A copy of the request (Encl 1) is forwarded for appropriate action
and direct reply to the requester.

4.  The point of contact for this action is Ms. Dorothy Hindman, Commercial (703) 275-
5146, DSN: 235, email address is ARMYNCFOIA@CONUS.ARMY.MIL.

Encl

Dorothy Hindman
HQ Installation Management Command
Freedom of Information Act Officer

# Exhibit 11

**From:** Peterson, John P Mr CIV USA MEDCOM HQ (john.peterson1@amedd.army.mil)
**To:** infoprivacylaw@yahoo.com
**Date:** Tue, October 27, 2009 5:02:37 PM
**Cc:** Hindman, Dorothy Ms CIV USA IMCOM FMWRC
**Subject:** FW: 25 November 2008 FOIA Request Pertaining to Domestic Violence (UNCLASSIFIED)

Classification: UNCLASSIFIED
Caveats: NONE

Mr. Hodes,

   This is in response to the Citizens for Responsibility and Ethics in Washington (CREW) Freedom of Information Act (FOIA) request of 25 November 2008. I apologize to you for the delay in responding to your request. Of the 19 items specified in your request, item 19 falls under the purview of the U.S. Army Medical Command:

     "any and all records of all case review committees, including but not limited to those at Fort Riley in Kansas
     and Fort Bragg in North Carolina, regarding the handling of domestic violence complaints and the treatment of
     those Soldiers alleged to have committed such offenses."

   This portion of your request was processed in accordance with the Freedom of Information Act (FOIA) 5 United States Code (U.S.C.) § 552 and the Privacy Act (PA) 5 U.S.C. § 552a. That review has been completed. Documents responsive to your request fall under the medical quality assurance system of records and are exempt from release pursuant to FOIA Exemption (b)(3)[10 USC § 1102] which protects the confidentiality of records, including medical quality assurance records, which are confidential and privileged, created by or for the Department of Defense. Additionally, the documents responsive to your request contain individually identifiable health information. The DoD Health Information Privacy Regulation (DoD 6025.18-R) issued pursuant to the Health Insurance Portability and Accountability Act of 1996, applies to such health information. Under the HIPAA Privacy Rule, protected health information pertaining to an individual may not be released without an authorization from that individual or the appropriate legal personal representative for that individual.

   Because your request has been denied, you are advised of your right to appeal this determination to the Secretary of the Army. If you decide to appeal at this time, your appeal must be submitted within 60 days of the date of this e-mail message. In your appeal, you must state the basis for your disagreement with the denial and the justification for the release of information associated with your request for this command. You may appeal either electronically or by mail. If you respond by mail your appeal should be addressed to: CDR U.S. Army Medical Command, Attention: Freedom of Information/Privacy Acts Office (MCPA), 1216 Stanley Road, Fort Sam Houston, Texas 78234-5049, for forwarding, as appropriate, to the Office of the Secretary of the Army. Please enclose a copy of this note along with your appeal. To ensure proper processing of any appeal the letter and the envelope should both bear the notation, "Privacy Act/Freedom of Information Act Appeal."

   Should you have any questions regarding this action I may be reached at (210) 221-7826 or email john.peterson1@amedd.army.mil.

Respectfully submitted,

jpp

John P Peterson
Chief, Freedom of Information/
Privacy Act Office
HQ, U.S. Army Medical Command
COMM: 210-221-7826

 Classification:  UNCLASSIFIED
Caveats: NONE

# Exhibit 12



**DEPARTMENT OF THE ARMY**
U. S. ARMY CRIMINAL INVESTIGATION COMMAND
U.S. ARMY CRIME RECORDS CENTER
6010 6TH STREET
FORT BELVOIR, VIRGINIA 22060-5506

REPLY TO
ATTENTION OF

**NOV 0 3 2009**

FA 09-0868

Ms. Melanie Sloan
Citizens for Responsibility and Ethics in Washington
1400 Eye Street, N.W. Suite 450
Washington, DC 20005

Dear Ms. Sloan:

This is in further response to your request for release of information from the files of the U.S. Army Criminal Investigation Command (USACIDC) and supplements our response of February 3, 2009. Your initial referred request was received on January 26, 2009.

In your request of November 25, 2008, you seek any and all records from the U.S. Army dated from January 1, 2001 to November 25, 2008 concerning 19 specific inquiries. This Center is only to able provide you with records pertaining to your request #2. An automated search of the Automated System Crime Records Center (ASCRC) disclosed that there were 3,080 USACIDC Reports of Investigation and 8,589 Military Police Reports containing one or more domestic abuse allegations and containing one or more Soldiers as the subject of an offense in the reports for the time frame of your request. ASCRC is not capable of associating an individual with a specific offense in a report and reports may contain multiple subjects and offenses. Therefore, this data should not be interpreted as the number of domestic abuse Soldier offenders, rather it is the number of reports that contain domestic abuse allegations in which at least one Soldier is listed as the subject of an offense in the report.

Questions regarding this action should be addressed in writing to the address shown on the letterhead or by calling 1-800-511-4786.

Sincerely,

Phillip J. McGuire
Director, Crime Records Center

Printed on ♻ Recycled Paper

# Exhibit 13

SCOTT A. HODES, ATTORNEY AT LAW
POST OFFICE BOX 42002
WASHINGTON, DC 20015
WWW.INFOPRIVACYLAW.COM

(301) 404-0502

MEMBER DC AND MD BARS                                                    INFOPRIVACYLAW@YAHOO.COM

November 4, 2009

CDR U.S. Army Medical Command
Attention: Freedom of Information/Privacy
 Acts Office (MCPA)
1216 Stanley Road
Fort Sam Houston, Texas 78234-5049

<u>FOIA Appeal-October 27, 2009 FOIA Denial</u>

Dear Appeals Officer:

This is a Freedom of Information Act ("FOIA") appeal on behalf of my client, Citizens for Responsibility and Ethics in Washington ("CREW"), for information pertaining to Domestic Violence issues requested on November 25, 2008.

On November 25, 2008, CREW submitted a request to the Department of the Army ("Army") seeking 19 categories of information pertaining to Domestic Violence in the Army. On January 7, 2009, this request was referred to six Army components. At some point the request was again referred to the Army Medical Command.

By e-mail dated October 27, 2009, the Army Medical Command responded to the request. The Army Medical Command stated that of the 19 items specified in the request, "item 19 falls under the purview of the U.S. Army Medical Command." However, the Army Medical Command denied the request pursuant to FOIA exemption 3 citing 10 U.S.C. § 1102, which protects the confidentiality of medical quality assurance records.

CREW appeals the denial of these records. Initially, CREW appeals the search for responsive records. Item 19 of this request was for "any and all records of all case review committees, including but not limited to those at Fort Riley in Kansas and Fort Bragg in North Carolina, regarding the handling of domestic violence complaints and the treatment of these Soldiers alleged to have committed such offenses." Item 19 of the request was for more than just medical quality assurance records, it was for any and all "case review committee" records. Thus, the search for records by the Army Medical Command was incomplete and a search for additional records should be conducted.

Furthermore, while exemption 3 does protect individual quality assurance records, it is not clear that all of the responsive records are individual quality assurance records. The denial letter only states that the responsive records "fall under the medical quality

assurance system of records" not that they are truly medical quality assurance records. Further, 10 U.S.C. § 1102(d)(1) states that "[n]othing in this section shall be construed as authorizing or requiring the withholding from any person or entity aggregate statistical information regarding the results of Department of Defense medical quality assurance programs."   Therefore, any aggregate statistical information contained in the responsive records should be segregated and released pursuant to the FOIA request.

Thus, CREW asks that this matter be remanded for a further search for responsive records and the release of any aggregate statistical information contained in the responsive records.

If you have any questions concerning this appeal, feel free to contact me at your convenience.

Sincerely,

Scott A. Hodes